**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIET MIKE NGO,
                    *Plaintiff-Appellant,*

v.

JEANNE S. WOODFORD, Warden; A.
P. KANE,
                    *Defendants-Appellees.*

No. 03-16042

D.C. No.
CV-01-20674-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy Fogel, District Judge, Presiding

Argued and Submitted
August 13, 2004—San Francisco, California

Filed March 24, 2005

Before: Harry Pregerson and Alex Kozinski, Circuit Judges,
and John S. Rhoades, Sr.,* District Judge.

Opinion by Judge Pregerson

---

*Honorable John S. Rhoades, Sr., Senior United States District Judge
for the Southern District of California, sitting by designation.

3589

## COUNSEL

Meir Feder, Jones Day, New York, New York, for the plaintiff and appellant.

Jennifer Perkell, Deputy Attorney General, San Francisco, California, for the defendants and appellees.

## **OPINION**

PREGERSON, Circuit Judge:

We are asked to determine whether the district court properly dismissed a prisoner's complaint for failing to exhaust all available administrative remedies as required by the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (codified as amended in scattered sections of 18, 28, and 42 U.S.C.), even though the prisoner's administrative appeal was deemed time-barred and no further level of appeal remained in the state prison's internal appeals process. This is an issue of first impression in our Circuit. We have jurisdiction under 28 U.S.C. § 1291, and reverse.

## I.   **Background**

Viet Mike Ngo is currently serving a life sentence at Avenal State Prison in California. Previously, Ngo was incarcerated at San Quentin State Prison. While at San Quentin, Ngo was placed in administrative segregation on October 26, 2000, as punishment for alleged "inappropriate activity" with volunteer Catholic priests. In December 2000, Ngo was placed back in the general prison population. As a condition of his release from administrative segregation, Ngo was restricted from participating in "special programs," such as evening fellowship and Bible study sessions. The prison also prohibited Ngo from corresponding with a former San Quentin Catholic Chapel volunteer.

On June 18, 2001, Ngo appealed the disciplinary action. The prison's Appeals Coordinator rejected Ngo's appeal as time-barred because Ngo had not filed his appeal within fifteen working days of "the event or decision being appealed." *See* Cal. Code Regs. tit. 15, § 3084.6(c); *see also id.* §§ 3084.3(c)(6), 3084.5(a)(1). Six days after the rejection, Ngo filed a second grievance contending that his appeal was in fact timely. Ngo claimed that because he was appealing the

continuing nature of his punishment, there were a series of continuing violations, and his appeal should not be time-barred. The Appeals Coordinator again rejected his appeal on the same untimeliness ground.

After the prison's Appeals Coordinator rejected Ngo's appeal, Ngo filed this action in district court under 42 U.S.C. § 1983. Ngo claimed that the restrictions on his participation in "special programs" violated his First Amendment rights to free speech and the free exercise of his religion. Ngo also asserted that the restrictions lessened the possibility that he would become eligible for parole. Finally, Ngo alleged that the prison officials defamed him by alleging that he had "engaged in sexual relationships with Catholic volunteer priests."

The district court granted the defendants' motion to dismiss Ngo's complaint. The court ruled that Ngo failed to exhaust all of his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") before seeking relief in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [§ 1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). In addition, the district court found that there were no extraordinary circumstances to excuse Ngo from exhausting his administrative remedies. Ngo now appeals the district court's order dismissing his complaint.

## II.   Discussion

### A.   Standard of Review

We review a district court's determination that a prisoner failed to exhaust administrative remedies *de novo*, and factual determinations for clear error. *Wyatt v. Terhune*, 315 F.3d 1108, 1117 (9th Cir.), *cert. denied sub nom. Alameida v. Wyatt*, 540 U.S. 810 (2003).

## B. The PLRA

The National Association of Attorneys General solicited lists of outrageously frivolous lawsuits from its members to catalyze the enactment of the PLRA. *See* Hon. Jon O. Newman, *Pro Se Prisoner Litigation: Looking for Needles in Haystacks*, 62 Brook. L. Rev. 519, 520 (1996). Shortly after these lists of frivolous suits were distributed to media and Congress, the PLRA was attached as a rider to an omnibus appropriations bill and signed into law. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (1996).

The PLRA significantly altered how and when prisoners could file suits in federal courts to challenge the conditions of their confinement. Despite the PLRA's impact on more than a million prisoners, hardly any legislative history exists behind its enactment. *See* 142 Cong. Rec. S2285-02 at S2296 (daily ed. Mar. 19, 1996) (statement of Sen. Kennedy) ("[T]he PLRA was . . . never the subject of a committee mark-up, and there is no Judiciary Committee report explaining the proposal. The PLRA was the subject of a single hearing in the Judiciary Committee, hardly the type of thorough review that a measure of this scope deserves."); *id.* at S2297 (statement of Sen. Simon) ("I am very discouraged that this legislation was considered as one of many issues on an appropriations bill. Legislation with such far reaching implications certainly deserves to be thoroughly examined by the committee of jurisdiction and not passed as a rider to an appropriations bill.").

Overall, the PLRA was intended to reduce judicial micromanagement of correctional facilities and to respond to what was perceived as a flood of frivolous lawsuits filed by prisoners.[1]

---

[1]This being said, the PLRA's sparse legislative history primarily consists of PLRA proponents parroting the frivolous cases compiled by the National Association of Attorneys General. *See, e.g.*, 141 Cong. Rec.

*See* 141 Cong. Rec. S14611-01 at S14626 (daily ed. Sept. 29, 1995) (statement of Sen. Dole) (stating that the amendment would put an end to "inmate litigation fun-and-games" and restrain micromanagement of state and local prison systems). To achieve these goals, the PLRA erected procedural hurdles designed to filter out frivolous prisoner claims. *See, e.g., id.* at S14627 (daily ed. Sept. 29, 1995) (statement of Sen. Hatch) ("Indeed, I do not want to prevent inmates from raising legitimate claims. This legislation will not prevent those claims from being raised. The legislation will, however, go far in preventing inmates from abusing the Federal judicial system."). Even so, this was a dramatic departure from established Supreme Court precedent. *Compare Wilwording v. Swenson*, 404 U.S. 249, 251 (1971) (per curiam) (declaring that inmates "are not held to any stricter standard of exhaustion [of remedies]" than other civil rights litigants), *with id.* § 1997e(a).

**[1]** The procedure at issue in the present case is the PLRA's exhaustion requirement. This requirement prohibits prisoners from bringing suits in district court before first exhausting all available administrative remedies. *See* 42 U.S.C. § 1997e(a).

During congressional hearings, the Department of Justice declared that the PLRA would make the exhaustion requirement applicable to prisoners consistent with other exhaustion

S14611-01 at S14627-29 (daily ed. Sept. 29, 1995) (statement of Sen. Reid); 142 Cong. Rec. S10576-02 at S10576-77 (daily ed. Sept. 16, 1996) (statement of Sen. Abraham). Sadly, several of the most widely cited cases of frivolous prisoner lawsuits were mischaracterized by the proponents of the PLRA. *See* 62 Brook. L. Rev. 519, 520 (stating that the descriptions of the facts of prisoners' lawsuits contained on the list of frivolous suits circulated to Congress and media were "at best highly misleading and, sometimes, simply false"); *see also Changing the Rules: Prison Officials and Legislators Mount an All-Out War Against Prisoners' Right to Legal Access, at* http://www.prisonactivist.org/crisis/plra-update. html (last visited February 18, 2005).

requirements. The PLRA was to "strengthen[ ] the administrative exhaustion rule in this context—and bring[ ] it more into line with administrative exhaustion rules that apply in other contexts—by generally prohibiting prisoner § 1983 suits until administrative remedies are exhausted." *Prison Reform: Enhancing the Effectiveness of Incarceration: Hearings on S. 3, S. 38, S. 400, S. 866, S. 930, H.R. 667 Before the Senate Comm. on the Judiciary*, 104th Cong. 20-21 (1995) (statement of Associate Attorney General John R. Schmidt).

In short, administrative exhaustion rules have two principal purposes. *See McCarthy v. Madigan*, 503 U.S. 140, 145 (1992) (superseded by amendment of §1997e(a)). The first is to protect an administrative agency's authority by giving the agency the first opportunity to resolve a controversy before a court intervenes in the dispute. *See id.* The second is to promote judicial efficiency by either resolving the dispute outside of the courts, or by producing a factual record that can aid the court in processing a plaintiff's claim. *Id.* at 145-46.

### C. Ngo Exhausted All Available Administrative Remedies as Required by the PLRA

To appeal a state prison's administrative decision, a California inmate must go through a four-step process.

*Step 1*: With exceptions not relevant here, within fifteen working days of "the event or decision being appealed," the inmate must first file an "informal" appeal, whereby "the appellant and staff involved in the action or decision attempt to resolve the grievance informally." *See* Cal. Code Regs. tit. 15, §§ 3084.5(a), 3084.6(c).

*Step 2*: Following rejection of the informal appeal, an inmate may file a first formal appeal with the prison's Appeals Coordinator within fifteen working days. *See id.* §§ 3084.5(b), 3084.6(c). The Appeals Coordinator, charged with screening and categorizing appeals, "may" reject appeals

if "[t]ime limits for submitting the appeal are exceeded and the appellant had the opportunity to file within the prescribed time constraints." *Id.* § 3084.3(c)(6). The regulations do not provide for review of an appeal at a higher administrative level if it has first been rejected on this procedural ground. *See id.* § 3084.3. But the prisoner may file a challenge with the Appeals Coordinator if he feels that the procedural ground was inaccurate. *See id.*

*Steps 3 and 4*: The second formal appeal is reviewed by the institution's head or regional parole administrator, while a designee of the Director of the Department of Corrections hears the third formal appeal. *See id.* § 3084.5(e)(1)-(2). The disposition of the third formal appeal is final and concludes all administrative remedies. *Id.* § 3084.1(a).

As required under California law, Ngo filed an appeal with the Appeals Coordinator on June 18, 2001.[2] The Appeals Coordinator exercised his discretion to screen out the appeal because Ngo did not file it within fifteen days of the December 2000 disciplinary action, as was required under the first step of California's prison administrative appeals process.[3] The Appeals Coordinator informed Ngo that the decision to screen out his untimely appeal could not be appealed unless Ngo alleged that his appeal was in fact timely. Consequently, Ngo challenged the Appeals Coordinator's reason for rejecting his appeal in a follow-up petition a week later, asserting

---

[2]The record is unclear whether the June 18, 2001, appeal was at the informal or first formal level. The district court referred to the June appeal as informal. Ngo, however, claims that a letter he sent on March 20, 2001, to the Deputy Warden constituted his informal appeal, while the June 18, 2001, appeal comprised his first formal appeal. The Appeals Coordinator screens out appeals at the first formal level, not at the informal level. This suggests that the June 2001 appeal, rejected by the Appeals Coordinator for untimeliness, was in fact Ngo's first formal appeal.

[3]Why prison filing deadlines tend to be so short is unclear. *See McCarthy*, 503 U.S. at 152 ("[W]e have not been apprised of any urgency or exigency justifying this timetable.").

that the ongoing nature of his injury preserved the timeliness of his appeal. The Appeals Coordinator again rejected Ngo's appeal.

The district court concluded that only a decision at the third formal level of appeal exhausts a prisoner's administrative remedies. Because no such ruling was rendered in the instant case, the district court held that Ngo had not exhausted his administrative remedies. According to the district court, the Appeals Coordinator's rejection of Ngo's appeal for untimeliness did not excuse Ngo from exhausting all levels of appeal, but this reasoning is not persuasive. The PLRA requires prisoners to exhaust all *available* administrative remedies before filing a § 1983 claim in federal court. *See* 42 U.S.C. § 1997e(a). With the Appeals Coordinator's second decision, Ngo exhausted his appeals because he could go no further in the prison's administrative system; no remedies remained available to him.

The defendants have the burden of raising and proving a prisoner's failure to exhaust under the PLRA. *See Wyatt*, 315 F.3d at 1119. Attempting to carry this burden, the defendants assert that Ngo's failure "to comply with applicable administrative filing requirements" was equivalent to a failure to exhaust. This argument, however, confuses the doctrines of exhaustion and procedural default.

As explained below, the failure to exhaust bars a remedy in federal court if one is still available in the state's administrative system. *See Franklin v. Johnson*, 290 F.3d 1223, 1230-31 (9th Cir. 2002). By contrast, procedural default has its origins in the adequate and independent state ground doctrine and blocks federal courts from considering a state court's judgment "if that judgment rests on a state-law ground that is both independent of the merits of the federal claim and has an adequate basis for the court's decision." *Id.* at 1230 (quoting *Harris v. Reed*, 489 U.S. 255, 260 (1989)). Thus, unlike the exhaustion doctrine, procedural default bars federal review in

two situations: "when a state court has been presented with the federal claim, but declined to reach the issue for procedural reasons, or if it is clear that the state court would hold the claim procedurally barred." *Id.* at 1230-31 (citing *Harris*, 489 U.S. at 263 n.9) (internal quotations omitted).

### D. Failure to Exhaust and the Procedural Default Doctrine

Twenty years ago, the Supreme Court noted the "difficult" questions that would be presented by imposing an exhaustion requirement on § 1983 suits, including what preclusive effect state administrative determinations would have on subsequent federal suits. *Patsy v. Bd. of Regents*, 457 U.S. 496, 513-14 (1982). In our case, defendants assert that Ngo failed to exhaust his available administrative remedies because the Appeals Coordinator held Ngo's claim to be procedurally barred for untimeliness. Procedural default, however, is not necessarily synonymous with a failure to exhaust. *Cf. Franklin*, 290 F.3d at 1230 (clarifying that the doctrines of exhaustion and procedural default "developed independently and on different grounds, apply in different situations, and lead to different consequences").

**[2]** To demonstrate a failure to exhaust, defendants must specify which remedies remain available to Ngo following the Appeals Coordinator's decision. *Cf. id.* at 1230-31. The defendants offer no guidance on how Ngo can cure his supposed failure to exhaust or what remedies, if any, remain available to Ngo. Instead, the defendants' argument rests on procedural default and not exhaustion. We must therefore determine whether a failure to timely exhaust a prison's administrative remedies under the PLRA procedurally bars a subsequent suit in district court.

To answer this question, we must first decide if the PLRA's exhaustion requirement is analogous to either administrative or habeas exhaustion. This will help us determine whether an

untimely prisoner grievance nonetheless satisfies the PLRA's exhaustion requirement or if the untimely grievance will be barred under the procedural default doctrine.

We are not the first circuit to address this issue. Four other circuits have ruled on whether an untimely administrative appeal satisfies the PLRA's exhaustion requirement. The Sixth Circuit held that it does; the Third, Seventh, and Tenth held that it does not.

### 1.    The Sixth Circuit: An Untimely Administrative Appeal Satisfies the PLRA's Exhaustion Requirement

In *Thomas v. Woolum*, 337 F.3d 720 (6th Cir. 2003), the Sixth Circuit held that a prisoner exhausts all available administrative remedies when he finishes "one complete round of the prison [grievance] process," regardless whether he filed a timely appeal. *Id.* at 733. The court explained that the PLRA's exhaustion provision is "a benefit accorded to state prisons, an opportunity to satisfy those inmate grievances the state wishes to handle internally." *Id.* at 726 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 492 (1973)).

According to the Sixth Circuit, when filing a late claim, a prisoner fulfills the letter and spirit of the PLRA by providing the state an opportunity to review the claim. *See id.* If the state refuses to consider the claim, then this decision should not "handcuff the federal courts in adjudicating cases involving important federal rights." *Id.*

### 2.    The Third, Seventh, and Tenth Circuits: An Untimely Administrative Appeal Does Not Satisfy the PLRA's Exhaustion Requirement

Confronted with similar situations, the Seventh and Tenth Circuits interpreted the PLRA's exhaustion requirement as requiring a timely grievance by a prisoner at the administra-

tive level before the prisoner initiates a federal cause of action. *See Ross v. County of Bernalillo*, 365 F.3d 1181 (10th Cir. 2004); *Pozo v. McCaughtry*, 286 F.3d 1022 (7th Cir. 2002), *cert. denied*, 537 U.S. 949 (2002). Both circuits feared that prisoners would purposely avoid administrative deadlines, thereby undermining the PLRA's objective of offering prisons the first opportunity to resolve a prisoner's complaint. *See Ross*, 365 F.3d at 1186; *Pozo*, 286 F.3d at 1023-24.

Specifically, the Seventh Circuit concluded that without some doctrine akin to procedural default, prisoners could " 'exhaust' state remedies by spurning them." *Id*. Thus, in the Seventh Circuit, "procedural default also means failure to exhaust one's remedies." *Id*. at 1024. *But see Franklin*, 290 F.3d at 1230 (distinguishing the two concepts). An inmate's failure to timely exhaust administrative remedies, regardless of the merits of his grievance, bars the inmate from bringing a subsequent federal suit. *See Pozo*, 286 F.3d at 1024 ("Failure to do what the state requires bars, and does not just postpone, suit under § 1983."). To hold otherwise, according to the Seventh Circuit, would leave the PLRA's exhaustion requirement "without any oomph." *Id.* at 1025.

The Third Circuit likewise concluded that the PLRA contains a procedural bar rule, emphasizing that its policy goals would be best served by requiring prisoners to file timely grievances with prisons before launching a § 1983 action. *See Spruill v. Gillis*, 372 F.3d 218, 230 (3d Cir. 2004) ("We believe that Congress's policy objectives will be served by interpreting § 1997e(a)'s exhaustion requirement to include a procedural default component."). But the *Spruill* court had some qualms about its holding. It found "neither position entirely satisfactory," and acknowledged that "an exhaustion rule can (though need not) be fairly read to include a procedural default component." *Id*. at 229-30.

As explained below, the Third, Seventh, and Tenth Circuits' arguments do not convince us, primarily because we

think their heavy reliance on the need for a procedural bar similar to that found in the habeas context is misplaced.

### 3. The PLRA's Exhaustion Requirement is Not Analogous to Habeas Exhaustion

[3] "[A]s a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act." *Rose v. Lundy*, 455 U.S. 509, 515 (1982); *see also Powell v. Lambert*, 357 F.3d 871, 874 (9th Cir. 2004) ("[I]f a state procedural bar is an adequate and independent ground for dismissal, habeas corpus is foreclosed in federal court . . . ."). That is why a state prisoner must first exhaust the remedies available at the state level before petitioning for federal habeas corpus relief. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (holding that the independent and adequate state ground doctrine bars federal habeas if the prisoner failed to meet a state procedural requirement).

Specifically, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Even though the habeas exhaustion requirement under § 2254 does not specifically mention procedural default, the Supreme Court has grafted procedural default onto § 2254's exhaustion requirement. As a result, a prisoner may be procedurally barred from bringing a habeas petition in federal court even though he has technically exhausted his claims with an untimely habeas petition filed in state court.

In habeas corpus cases, the merger of exhaustion with procedural default protects federal-state comity by providing state courts with the first opportunity to correct their errors. This upholds the dignity of state judgments by preventing inmates from "undermin[ing] the State's interest in enforcing

its laws" through an "end run" by strategically defaulting in state court to avoid the habeas exhaustion requirement. *Coleman*, 501 U.S. at 730-31. Essentially, the state criminal process should be the "main event" rather than a "tryout on the road" to a dispositive federal habeas hearing. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) (internal quotation marks omitted).

**[4]** A state's sovereignty, however, is less threatened when a federal court reviews "a non-criminal state administrative process" for violations of constitutional rights compared to when a federal court reviews a collateral attack on a sovereign state court's judgment. *See Thomas*, 337 F.3d at 727 n.2. Section 1983 suits by prisoners do not collaterally attack a prison grievance proceeding and do not require a collateral review.

**[5]** Even though the PLRA uses language similar to that of § 2254, nothing in the PLRA mentions procedural default or indicates an intent to bar suits by prisoners who fail to meet administrative time requirements mandated by prisons. In fact, the language of § 1997e(a) strongly suggests that an exhaustion requirement defers, not bars, a federal suit: inmates may not sue "*until* such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). This is in contrast to the language used for habeas exhaustion requirement: the writ may not issue "*unless* . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1) (emphasis added).

**[6]** Moreover, the PLRA has no language instructing courts how to treat administrative findings. In this case, for instance, the Appeals Coordinator determined that Ngo's appeal was untimely, resolving a very difficult legal issue that depends on whether the restrictions should be treated as a continuing injury or a one-time harm at the time they were imposed. Unlike § 2254, which explicitly provides a standard of review for collateral re-examination of state court rulings on issues of fact and law, *see* 28 U.S.C. § 2254(d), nothing in the PLRA

directs federal courts to defer to such a legal conclusion, or to any factual findings made by prison administrators. Prison grievance proceedings are not sufficiently judicial in nature to warrant preclusive effect at all. *Cf. Cleavinger v. Saxner*, 474 U.S. 193, 203-04 (1985) (holding that members of a prison disciplinary committee were not entitled to the absolute immunity accorded judges because they were not "professional hearing officers, as are administrative law judges," and that disciplinary hearings were not required to observe judicial norms). Prison grievance administrators are not judges trained to handle the intricacies of the legal issues in cases they hear; they do not enforce constitutional rights and cannot award damages to inmates. Furthermore, the standards governing suits in state or federal courts are not necessarily adhered to during prison grievance proceedings. Simply put, a prison's administrative grievance proceeding can in no way be the "main event" in a prisoner's attempt to have a *constitutional* violation redressed.

The defendants urge that barring Ngo's § 1983 action will best serve the policy objectives of the PLRA's exhaustion requirement by "afford[ing] corrections officials time and opportunity to address complaints internally," and to take "corrective action . . . [that] might improve prison administration and satisfy the inmate." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). Furthermore, the defendants worry that, by the time an inmate files an appeal, the inmate's injury may "no longer be amenable to intervention or rectification by the prison." Appellees' Supplemental Answering Brief at 7. In addition, the defendants express concern that a ruling in favor of Ngo would encourage prisoners to file a late claim in order to skip the administrative process and head straight to federal court.

But the defendants fail to recognize that internal administrative appeals offer prisoners the fastest route to a remedy. *See Thomas*, 337 F.3d at 732 ("[P]otential litigants will still have every incentive to raise their grievance within the pris-

on's timelines, because it is in the prison grievance process that inmates will, for most practical purposes, receive their swiftest and most effective remedies."). We have no reason to believe that prisoners will not avail themselves of "the most efficient mechanism to remedy a violation of federal law." *Id.* at 726. Prisoners have every incentive to seek administrative review before suing in federal court. After all, the administrative process provides prisoners with an additional attempt to win a favorable ruling. *See Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 764 (1979) (finding "[n]o reason" why one would "forgo an available state remedy" where, as here, "[p]rior resort to the state remedy would not impair the availability of the federal remedy"). These are all strong reasons why prisoners will not bypass the administrative process by purposely not filing a timely grievance. Here, for example, we are not dealing with a case where the prisoner deliberately bypassed the administrative process, or even a case of protracted delay. Ngo gave the prison grievance process a chance to work; indeed, it's debatable whether his appeal was even untimely.

Even assuming that an inmate wished to skip a prison's grievance system in order to quickly get into district court, the inmate must still submit his untimely grievance to the prison and appeal all denials of his claims completely through the prison's administrative process to satisfy the PLRA's exhaustion requirement. Holding that the PLRA does not contain a procedural default bar thus would in no way obstruct the goal of allowing prison officials first crack at resolving prisoners' grievances. It is for the prison to decide whether to exercise its discretion and accept or refuse the opportunity to hear the case on the merits regardless whether the grievance is timely filed. In this case, the Appeals Coordinator *could* have considered Ngo's appeal; she was authorized to do so by the grievance regulations, but elected not to.

### 4. The PLRA's Exhaustion Requirement Is More Like Administrative Exhaustion

The exhaustion doctrine has also been used in administrative law. Exhaustion in the administrative context protects an

administrative agency's authority. *See McCarthy*, 503 U.S. at 145. In addition, administrative exhaustion "promotes judicial efficiency" by allowing the agency the opportunity to correct its own errors and to create a record which might facilitate judicial review. *Id.*

**[7]** In cases involving other federal statutes, the Supreme Court has stated that administrative exhaustion does not include a procedural default component. For example, in *EEOC v. Commercial Office Products Co.*, 486 U.S. 107 (1988), the Supreme Court held that a Title VII complainant's untimely grievance was irrelevant in determining whether she could proceed to federal court. *See id.* at 123. Similarly, in *Oscar Mayer & Co.*, the Court held that state procedural defaults in claims under the Age Discrimination in Employment Act "cannot foreclose federal relief." 441 U.S. at 762; *see also id.* at 759 ("[T]here is no [statutory] requirement that, in order to commence state proceedings and thereby preserve federal rights, the grievant must file with the State within whatever time limits are specified by state law.").

Thus, a procedural default has not been implanted into either the Age Discrimination in Employment Act's or Title VII's exhaustion requirements. Both cases give us pause about imposing a sanction that bars claims which failed to comply with administrative timing deadlines, in the absence of any statutory direction to do so. *Cf. Franklin*, 290 F.3d at 1231 (explaining that the "long-established differences between the exhaustion requirement and the procedural default doctrine preclude any conclusion that Congress implicitly intended to reach" one by a statutory reference to the other); *Patsy*, 457 U.S. at 514 (reasoning that the "difficult questions concerning the design and scope of an exhaustion requirement . . . might be answered swiftly and surely by legislation").

Moreover, such a scheme would penalize the less sophisticated and less informed who are unable to satisfy complex

and demanding procedural requirements, regardless of the merits of their claims. *Cf. McCarthy*, 503 U.S. at 153 ("As a practical matter, the filing deadlines . . . may pose little difficulty for the knowledgeable inmate accustomed to grievances and court actions. But they are a likely trap for the inexperienced and unwary inmate, ordinarily indigent and unrepresented by counsel, with a substantial claim.").

Congress intended § 1997e(a) "to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524. Merging procedural default with the PLRA's exhaustion requirement, though, would potentially reduce the quantity of meritorious suits and would not necessarily improve the quality of the surviving suits. In addition, neither the interests of federalism nor comity are served by imposing a procedural default component on the PLRA's exhaustion requirement. We recognize that procedural bars will certainly filter out some suits brought by prisoners. But neither can we be blind to "the serious impact on prisoners with legitimate claims who are unrepresented, unschooled in litigation, and often ill-equipped to negotiate an administrative system far harsher in its procedural requirements than state or federal courts."[4] Kermit Roosevelt III, *Exhaustion Under the Prison Litigation Reform Act: The Consequence of Procedural Error*, 52 Emory L.J. 1771, 1813 (2003).

**[8]** In sum, the PLRA exhaustion requirement tends to resemble administrative exhaustion. Thus, the reasons for utilizing procedural default doctrine in the habeas context are generally irrelevant to prisoner suits under the PLRA. There

---

[4]For instance, the current limitations period for § 1983 actions in California is two years. *See Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004). If the plaintiff is a California inmate the statute of limitations would effectively shrink to fifteen working days under the procedural bar rule adopted in cases like *Pozo. See* Cal. Code Regs. tit. 15, §§ 3084.3(c)(6), 3084.5(a)(1), 3084.6(c). The purpose of the PLRA was to reduce the number of meritless lawsuits, not simply to make things harder for inmates, irrespective of the merits of their claims.

is no need for us to convert a rule governing the timing of lawsuits into one that bars them entirely.

## III.  CONCLUSION

In a prison grievance system, the trust between prisoners and the administration is minimal at best, and nonexistent at worst. As is, prison grievance procedures are sufficiently difficult for prisoners to comply with. Judicial imposition of the procedural default doctrine on suits brought under the PLRA, coupled with the relatively short filing periods for prisoner grievances, might very well preclude prisoner-litigants with meritorious claims from ever bringing suit. Not even proponents of the PLRA wanted to bar worthy claims.

Procedural default is not an inextricable element of the PLRA's exhaustion requirement. If it were, prisoners' access to courts would be based on their ability to navigate procedural minefields, not on whether their claims had any merit. Moreover, prison administrators should not be given an incentive to fashion grievance procedures which prevent or even defeat prisoners' meritorious claims.

[9] Thus, we hold that Ngo exhausted all administrative remedies available to him as required by the PLRA when he completed all avenues of administrative review available to him: His administrative appeal was deemed time-barred and no further level of appeal remained in the state prison's internal appeals process. We also hold that the PLRA's exhaustion requirement does not bar subsequent judicial consideration of an exhausted administrative appeal that was denied on state procedural grounds.[5] Accordingly, the district court's dismissal of Ngo's complaint is **REVERSED**.

---

[5]We therefore do not decide whether the Appeals Coordinator properly determined that Ngo's appeal was untimely, or what standard of review would apply were we to do so.