Justice Breyer,
concurring in the judgment.
I agree with the Court that, in enacting the Prison Litigation Reform Act (PLRA), 42 U. S. C. § 1997e(a), Congress intended the term “exhausted” to “mean what the term means in administrative law, where exhaustion means proper exhaustion.” Ante, at 93. I do not believe that Congress desired a system in which prisoners could elect to bypass prison grievance systems without consequences. Administrative law, however, contains well-established exceptions to exhaustion. See Sims v. Apfel, 530 U. S. 103, 115 (2000) (Breyer, J., joined by Rehnquist, C. J., and Scalia and Kennedy, JJ., dissenting) (constitutional claims); Shalala v. Illinois Council on Long Term Care, Inc., 529 U. S. 1, 13 (2000) (futility); McKart v. United States, 395 U. S. 185, 197-201 (1969) (hardship); McCarthy v. Madigan, 503 U. S. 140, 147-148 (1992) (inadequate or unavailable administrative remedies); see generally II R. Pierce, Administrative Law Treatise § 15 (4th ed. 2002). Moreover, habeas corpus law, which contains an exhaustion requirement that is “substantively *104 similar” to administrative law’s and which informs the Court’s opinion, ante, at 92-93, also permits a number of exceptions. See post, at 109, n. 5 (Stevens, J., dissenting) (noting that habeas corpus law permits “petitioners to overcome procedural defaults if they can show that the procedural rule is not firmly established and regularly followed, if they can demonstrate cause and prejudice to overcome a procedural default, or if enforcing the procedural default rule would result in a miscarriage of justice” (citation omitted)).
At least two Circuits that have interpreted the statute in a manner similar to that which the Court today adopts háve concluded that the PLRA’s proper exhaustion requirement is not absolute. See Spruill v. Gillis, 372 F. 3d 218, 232 (CA3 2004); Giano v. Goord, 380 F. 3d 670, 677 (CA2 2004). In my view, on remand, the lower court should similarly consider any challenges that respondent may have concerning whether his case falls into a traditional exception that the statute implicitly incorporates.
Justice Stevens, with whom Justice Souter and Justice Ginsburg join, dissenting.
The citizen’s right to access an impartial tribunal to seek redress for official grievances is so fundamental and so well established that it is sometimes taken for granted. A state statute that purported to impose a 15-day period of limitations on the right of a discrete class of litigants to sue a state official for violation of a federal right would obviously be unenforceable in a federal court. The question in this case is whether, by enacting the exhaustion requirement in the Prison Litigation Reform Act of 1995 (PLRA), Congress intended to authorize state correction officials to impose a comparable limitation on prisoners’ constitutionally protected right of access to the federal courts. The text of the statute, particularly when read in the light of our well-settled jurisprudence, provides us with the same unambiguous negative answer that common sense would dictate.
*105 I
Congress enacted the following exhaustion requirement in the PLRA:
“No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.” 42 U. S. C. § 1997e(a).
This provision requires prisoners to exhaust informal remedies before filing a lawsuit under federal law. They must file an administrative grievance and, if the resolution of that grievance is unsatisfactory to them, they must exhaust available administrative appeals. The statute, however, says nothing about the reasons why a grievance may have been denied; it does not distinguish between a denial on the merits and a denial based on a procedural error. It does not attach any significance to a prison official’s decision that a prisoner has made procedural missteps in exhausting administrative remedies. In the words of federal courts jurisprudence, the text of the PLRA does not impose a sanction of waiver or procedural default upon those prisoners who make such procedural errors. See Engle v. Isaac, 456 U. S. 107, 125-126, n. 28 (1982) (explaining that “the problem of waiver is separate from the question whether a state prisoner has exhausted state remedies”).[1] The plain text of the PLRA simply requires that “such administrative remedies as are available” be exhausted before the prisoner can take the se *106 rious step of filing a federal lawsuit against the officials who hold him in custody.
Today, however, the Court concludes that the “PLRA exhaustion requirement requires proper exhaustion,” ante, at 93. The absence of textual support for that conclusion is a sufficient reason for rejecting it. Unlike 28 U. S. C. § 2244(d)(2), a tolling provision of the Antiterrorism and Effective Death Penalty Act of 1996, which was signed into law just two days before the PLRA, 42 U. S. C. § 1997e(a) lacks any textual requirement of proper exhaustion. See Artuz v. Bennett, 531 U. S. 4, 8 (2000) (explaining the importance of the textual requirement that an application be “properly filed” under 28 U. S. C. § 2244(d)(2)). Instead, just as in the habeas context, under the PLRA a prisoner “who has [procedurally] defaulted his federal claims in [a state prison grievance proceeding] meets the technical requirements for exhaustion; there are no state remedies any longer ‘available’ to him.” Coleman v. Thompson, 501 U. S. 722, 732 (1991). Accordingly, under the plain text of 42 U. S. C. § 1997e(a), respondent satisfied his duty to exhaust available administrative remedies before filing a federal lawsuit.
II
The majority essentially ignores the PLRA’s text,[2] suggesting instead that general administrative law principles, which allow courts in certain circumstances to impose proce *107 dural default sanctions as a matter of federal common law, suggest we should read waiver into the PLRA. However, as discussed in Part III, infra, our cases make clear that such extratextual waiver sanctions are only appropriate if a statute directs a federal court to act as an appellate tribunal directly reviewing the decision of a federal agency. Because actions brought under Rev. Stat. § 1979, 42 U. S. C. § 1983, such as respondent’s, are de novo proceedings in federal district court, the majority’s invocation of these common-law principles is seriously misguided.
The majority’s disregard of the plain text of the PLRA is especially unjustified in light of the backdrop against which the statute was enacted. We presume, of course, that Congress is familiar with this Court’s precedents and expects its legislation to be interpreted in conformity with those precedents. See, e. g., Edelman v. Lynchburg College, 535 U. S. 106, 117, n. 13 (2002); Porter v. Nussle, 534 U. S. 516, 528 (2002); North Star Steel Co. v. Thomas, 515 U. S. 29, 34 (1995). This strong presumption is even more forceful when the underlying precedent is “‘unusually important.’” Gebser v. Lago Vista Independent School Dist., 524 U. S. 274, 294, n. 1 (1998) (quoting Cannon v. University of Chicago, 441 U. S. 677, 699 (1979)). Consistent with this presumption, if we have already provided a definitive interpretation of the language in one statute, and Congress then uses nearly identical language in another statute, we will give the language in the latter statute an identical interpretation unless there is a clear indication in the text or legislative history that we should not do so. See, e. g., United States v. Wells, 519 U. S. 482, 495 (1997). Under these elementary principles of statutory interpretation, the PLRA’s exhaustion requirement does not incorporate a procedural default component.
As the Solicitor General correctly points out in his brief supporting petitioners, “the PLRA’s exhaustion provision is essentially identical to that of the habeas corpus statute.” Brief for United States as Amicus Curiae 13. Specifically, *108 a provision in the federal habeas statute, first enacted in 1948 as a codification of a previous judge-made rule,[3] bars relief “unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State,” 28 U. S. C. § 2254(b)(1)(A).[4] The PLRA similarly bars judicial relief “until such administrative remedies as are available are exhausted,” 42 U. S. C. § 1997e(a). The only noteworthy distinction between the two provisions is that 28 U. S. C. § 2254(b)(1)(A) uses the word “unless,” whereas 42 U. S. C. § 1997e(a) uses the word “until.” If anything, this distinction suggests that the exhaustion requirement in the PLRA is less amenable to a waiver sanction than the comparable requirement in the habeas statute: The word “until” indicates a temporal condition whereas the word “unless” would have been more appropriate for a procedural bar.
Notwithstanding the use of the word “unless” in 28 U. S. C. § 2254(b)(1)(A), as the majority correctly recognizes, we have held that state-court remedies are “exhausted” for the purposes of the federal habeas statute so long as “they are no longer available, regardless of the reason for their unavailability,” ante, at 92-93. In other words, the exhaustion requirement in the federal habeas statute does not incorporate a procedural default sanction.[5]
*109 Between Congress’ codification of the exhaustion requirement in federal habeas law and Congress’ adoption of an essentially identical exhaustion requirement in the PLRA, we decided no fewer than six cases in which we stated explicitly that a habeas petitioner satisfies the statutory exhaustion requirement so long as state-court remedies are no longer available to him at the time of the federal-court filing, regardless of the reason for their unavailability. See Coleman, 501 U. S., at 731; Castille v. Peoples, 489 U. S. 346, 351 (1989); Teague v. Lane, 489 U. S. 288, 298 (1989); Engle, 456 U. S., at 125, n. 8; Humphrey v. Cady, 405 U. S. 504, 516 (1972); Fay v. Noia, 372 U. S. 391, 434-435 (1963).
The Court rejects the obvious analogy to habeas law because the wording of the PLRA’s exhaustion provision is also “strikingly similar to our description of the doctrine of administrative exhaustion “no one is entitled to judicial relief for a supposed or threatened injury until the prescribed ad *110 ministrative remedy has been exhausted”’),” ante, at 102 (quoting McKart v. United States, 395 U. S. 185, 193 (1969), in turn citing Myers v. Bethlehem Shipbuilding Corp., 303 U. S. 41, 50-51 (1938)). The language quoted by the majority from our case law is indeed similar to the language of the PLRA (and the habeas corpus statute). But this provides no help to the majority: We clearly used this language to describe only an exhaustion requirement, not a procedural default sanction.
The quoted language originally appeared in Justice Brandéis’ opinion in Myers, 303 U. S., at 50-51. Myers is a simple exhaustion case: The question presented was whether an employer could seek the immediate intervention of federal courts in response to a complaint filed with the National Labor Relations Board that it had engaged in unfair labor practices, or whether it had to await the conclusion of the Board’s proceedings to avail itself of judicial review. The case was purely about timing—there was no discussion whatever of procedural default.
McKart clearly recognized that the language of Myers concerned only exhaustion, not procedural default. Immediately after quoting Myers, the McKart Court discussed the benefits of exhaustion (primarily avoiding premature interruption of the agency process), and drew an analogy to judicial rules that limit interlocutory appeals, without making any reference to procedural default. See 395 U. S., at 193-194. It was not until later in the opinion that the McKart Court turned to a discussion of the considerations underlying the imposition of a procedural default sanction in cases “where the administrative process is at an end and a party seeks judicial review of a decision that was not appealed through the administrative process.” Id., at 194.
In sum, the language the majority quotes from McKart further supports the presumption that Congress intended the exhaustion requirement in the PLRA to be read in conformity with our decisions interpreting the exhaustion re *111 quirement in the federal habeas statute—that is, to require exhaustion, but not to impose a waiver sanction for procedural errors made in the course of exhaustion.
Ill
Absent any support for a procedural default sanction in the text of the PLRA, the Court turns to background principles of administrative law in an effort to justify its holding. See ante, at 89-91. The Court’s discussion of these background administrative law principles misapprehends our precedent.
As a general rule in the administrative law context, courts should not “ ‘topple over administrative decisions unless the administrative body has not only erred, but has erred against objection made at the appropriate time under its practice.’” Ante, at 90 (quoting United States v. L. A. Tucker Truck Lines, Inc., 344 U. S. 33, 37 (1952)). This doctrine is, “like most judicial doctrines, subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.” McKart, 395 U. S., at 193 (footnote omitted); see id., at 198-201 (declining to apply waiver doctrine in the circumstances of the case before it).
The waiver doctrine in administrative law is “largely [a] creatur[e] of statute.” Sims v. Apfel, 530 U. S. 103, 107 (2000). In other words, many statutes explicitly prohibit courts from considering claims “‘that ha[ve] not been urged’ ” before the administrative agency. Id., at 108 (quoting National Labor Relations Act, 29 U. S. C. § 160(e) (1982 ed.)). See L. A. Tucker Truck Lines, 344 U. S., at 36, n. 6 (collecting statutes). It is important to emphasize that statutory waiver requirements always mandate, by their plain terms, that courts shall not consider arguments not properly raised before the agency; we have never suggested that the word “exhaustion,” standing alone, imposes a statutory waiver requirement. Accordingly, the Court’s claim *112 that a procedural default sanction is mandated by simply “interpreting and applying the statutory requirement set out in the PLRA exhaustion provision,” ante, at 91, n. 2, is patently erroneous.
In the federal administrative law context we have also imposed waiver requirements even in the absence of explicit statutory directive. This judge-made rule, discussed extensively by the majority, see ante, at 88-91, however, is based on “an analogy to the rule that appellate courts will not consider arguments not raised before trial courts.” Sims, 530 U. S., at 108-109. As amici curiae law professors explain, this is because, in the context of such appellate review proceedings, procedural errors in the course of exhaustion naturally create bars to review because the decision under review rests on a procedural ground. Brief for Law Professors 1. Moreover, the rule that appellate tribunals will not consider claims not properly exhausted below prevents parties from being unfairly surprised on appeal by resolution of issues about which they lacked an opportunity or incentive to introduce evidence at trial. See Sims, 530 U. S., at 109. Accordingly, whether a court should impose a procedural default sanction for issues not properly exhausted in a prior administrative proceeding “depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding.” Ibid, (citing L. A. Tucker Truck Lines and Hormel v. Helvering, 312 U. S. 552 (1941)). If the analogy does not hold, we will not impose a procedural default sanction. See Sims, 530 U. S., at 108-110.[6]
*113 Applying these principles, it is clear that ordinary principles of administrative law do not justify engrafting procedural default into the PLRA. The purpose of a 42 U. S. C. § 1983 action such as that filed by respondent is not to obtain direct review of an order entered in the grievance procedure, but to obtain redress for an alleged violation of federal law committed by state corrections officials. See, e. g., Mitchum v. Foster, 407 U. S. 225, 242 (1972). It is undisputed that the PLRA does nothing to change the nature of the federal action under § 1983; prisoners who bring such actions after exhausting their administrative remedies are entitled to de novo proceedings in the federal district court without any deference (on issues of law or fact) to any ruling in the administrative grievance proceedings. In sum, because federal district court proceedings in prison condition litigation bear no resemblance to appellate review of lower court decisions, the administrative law precedent cited by the majority makes clear that we should not engraft a judge-made procedural default sanction into the PLRA.[7] The majority’s misapprehension of our precedent is especially troubling because, as the American Bar Association points out, we should be particularly hesitant to impose “judicially-created procedural technicalities ... fin a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.’” *114 Brief as Amicus Curiae 11 (quoting Oscar Mayer & Co. v. Evans, 441 U. S. 750, 765, n. 13 (1979)).[8]
Finally, the majority’s invocation of judge-made administrative law principles fails for an entirely separate reason: An “established exception” to the judge-made doctrine of procedural default in review of administrative proceedings permits individuals to raise constitutional complaints for the first time in federal court, even if they failed to raise those claims properly before the agency. Sims, 530 U. S., at 115 (Breyer, J., joined by Rehnquist, C. J., and Scalia and Kennedy, JJ., dissenting) (citing Mathews v. Eldridge, 424 U. S. 319, 329, n. 10 (1976)). Because respondent has raised constitutional claims, under our precedent, the Court may not, as a matter of federal common law, apply an extrastatutory waiver requirement against him.
IV
The principal arguments offered by the Court in support of its holding are policy arguments that, in its view, are grounded in the purposes of the PLRA.[9] The majority correctly identifies two of the principal purposes of the PLRA: (1) affording corrections officials time and opportunity to address complaints internally before the initiation of a federal lawsuit; and (2) reducing the quantity, and improving the quality, of prison litigation. Both of these purposes would *115 be served by the PLRA, even if the Court did not engraft a procedural default sanction into the statute.
The first policy concern identified by the majority does not even arguably justify either a timeliness requirement or a procedural default sanction. Prison officials certainly have the opportunity to address claims that were filed in some proeedurally defective manner; indeed, California, like the vast majority of state prison systems, explicitly gives prison administrators an opportunity to hear untimely or otherwise proeedurally defective grievances. Cal. Code Regs., tit. 15, § 3084.3(c). See generally Roosevelt, Exhaustion Under the Prison Litigation Reform Act: The Consequence of Procedural Error, 52 Emory L. J. 1771, 1810, and n. 192 (2003) (hereinafter Roosevelt). Because it is undisputed that the PLRA mandates that prisoners exhaust their administrative remedies before filing a federal lawsuit, prison officials will have the opportunity to address prisoners’ claims before a suit is filed.[10]
Second, the PLRA has already had the effect of reducing the quantity of prison litigation, without the need for an extrastatutory procedural default sanction. As petitioners themselves point out, the number of civil rights suits filed by prisoners in federal court dropped from 41,679 in 1995 to 25,504 in 2000, and the rate of prisoner filing dropped even more dramatically during that period, from 37 prisoner suits per 1,000 inmates to 19 suits per 1,000 inmates. By contrast, between 2000 and 2004, the rate of filing remained relatively constant, dropping only “slight[ly]” to approximately 16 suits per 1,000 inmates. See Brief for Petitioners 21-22. The *116 sharp drop in prison litigation between 1995 and 2000 occurred before the Seventh Circuit’s opinion in Pozo v. McCaughtry, 286 F. 3d 1022 (2002), which was the first appellate decision engrafting a procedural default sanction into the PLRA. Prior to Pozo, the federal courts had regularly-assumed that the PLRA did not create any procedural default sanction, and dismissals for failure to exhaust were without prejudice. See Roosevelt 1780-1781 (discussing cases). Thus, the PLRA, including its simple exhaustion requirement, was sufficient to reduce the quantity of prisoner suits without any procedural default requirement. This is not surprising: Because the exhaustion requirement always ensures that prison officials have an opportunity to address claims brought by prisoners before a federal lawsuit, some prisoners will be “successful in the administrative process, and others are persuaded by the proceedings not to file an action in federal court,” ante, at 94, in part because “the very fact of being heard . . . can mollify passions,” Booth v. Churner, 532 U. S. 731, 737 (2001).[11]
Ordinary exhaustion also improves the quality of prisoner suits. By giving prison officials an opportunity to address a prisoner’s grievance before the initiation of the lawsuit, ordinary exhaustion “often results in the creation of an administrative record that is helpful to the court,” ante, at 95.[12]
*117 I acknowledge, of course, that the majority’s creation of a waiver sanction for procedural missteps during the course of exhaustion will have an even more significant effect in reducing the number of lawsuits filed by prisoners. However, “no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute’s primary objective must be the law.” Rodriguez v. United States, 480 U. S. 522, 525-526 (1987) (per curiam) (emphasis deleted).
The competing values that Congress sought to effectuate by enacting the PLRA were reducing the number of frivolous filings, on one hand, while preserving prisoners’ capacity to file meritorious claims, on the other. As explained by Senator Hatch when he introduced the legislation on the Senate floor, the PLRA was needed because the quantity of frivolous suits filed by prisoners was, in Senator Hatch’s view, making it difficult for “courts to consider meritorious claims.” 141 Cong. Rec. 27042 (1995). He continued: “Indeed, I do not want to prevent inmates from raising legitimate claims. This legislation will not prevent those claims from being raised.” Ibid. Similarly, as Senator Thurmond, a cosponsor of the bill, stated: “[The PLRA] will allow meritorious claims to be filed, but gives the judge broader discretion to prevent frivolous and malicious lawsuits filed by prison inmates.” Id., at 27044.
But the procedural default sanction created by this Court, unlike the exhaustion requirement created by Congress, bars *118 litigation at random, irrespective of whether a claim is meritorious or frivolous.[13] Consider, for example, an inmate who has been raped while in prison. Such a scenario is far from hypothetical; in enacting the Prison Rape Elimination Act of 2003,42 U. S. C. § 15601 et seq. (2000 ed., Supp. III), Congress estimated that some one million people have been sexually assaulted in the Nation’s prisons over the last 20 years, § 15601(2). Although not all of these tragic incidents result in constitutional violations, the sovereign does have a constitutional duty to “provide humane conditions of confinement,” Farmer v. Brennan, 511 U. S. 825, 832 (1994). Accordingly, those inmates who are sexually assaulted by guards, or whose sexual assaults by other inmates are facilitated by guards, have suffered grave deprivations of their Eighth Amendment rights. Yet, the Court’s engraftment of a procedural default sanction into the PLRA’s exhaustion requirement risks barring such claims when a prisoner fails, inter alia, to file her grievance (perhaps because she correctly fears retaliation[14]) within strict time requirements that are generally no more than 15 days, and that, in nine States, are between 2 and 5 days.[15]
Much of the majority opinion seems to assume that, absent the creation of a waiver sanction, prisoners will purposely circumvent prison grievance proceedings. However, prisoners generally lack both the incentive and the capacity to en *119 gage in such evasive tactics. Because federal courts do not provide any deference to administrative decisions by prison officials and any later federal suit is de novo, prisoners—even prisoners who are acting in bad faith—lack an incentive to avoid filing an administrative grievance unless they fear retaliation. Moreover, because prisoners must exhaust administrative' remedies, prison officials can always thwart efforts by prisoners to avoid the grievance process by simply exercising their discretion to excuse any procedural defect in the presentation of the prisoners’ claims.
At any rate, there is a simple solution that would allow courts to punish prisoners who seek to deliberately bypass state administrative remedies, but that would not impose the Draconian punishment of procedural default on prisoners who make reasonable, good-faith efforts to comply with relevant administrative rules but, out of fear of retaliation, a reasonable mistake of law, or simple inadvertence, make some procedural misstep along the way. Federal courts could simply exercise their discretion to dismiss suits brought by the former group of litigants but not those brought by the latter.
The majority argues that imposing a sanction against prisoners who deliberately bypass administrative remedies “neither has a statutory basis nor refers to a concept of exhaustion from an existing body of law,” ante, at 98. In fact, this criticism applies to the majority’s engraftment of an overinclusive procedural default sanction into the PLRA. If this Court insists upon rewriting § 1997e(a) in light of its understanding of the statute’s purposes, surely the majority should add to the statute no harsher a sanction for making a procedural error during exhaustion than is necessary to accomplish its policy goals.
Moreover, ordinary abstention principles allow federal district courts to dismiss suits brought by prisoners who have deliberately bypassed available state remedies. Federal courts have the power to decline jurisdiction in exceptional *120 circumstances, including the need to promote “wise judicial administration.” Quackenbush v. Allstate Ins. Co., 517 U. S. 706, 716 (1996) (internal quotation marks omitted). Indeed, in Fay, we emphasized the discretion of district court judges in embracing precisely such a deliberate bypass regime in the habeas corpus statute. See 372 U. S., at 438. Applying such a deliberate bypass sanction to the PLRA would ensure that prisoners who act in bad faith are penalized, while not interfering with the capacity of other inmates to litigate meritorious constitutional claims.
In sum, the version of the PLRA Congress actually enacted, which includes an exhaustion requirement but not a procedural default sanction, is plainly sufficient to advance the policy values identified by the Court. Moreover, if, as the Court worries, there are many prisoners who act in bad faith and purposely eschew administrative remedies, the imposition of a deliberate bypass standard would resolve that problem, without depriving litigants who act in good faith but nonetheless make a procedural error from obtaining judicial relief relating to their valid constitutional claims. The majority’s holding is as unsupported by the policy concerns it discusses as it is by the text of the statute.
V
The majority leaves open the question whether a prisoner’s failure to comply properly with procedural requirements that do not provide a “meaningful opportunity for prisoners to raise meritorious grievances” would bar the later filing of a suit in federal court. Ante, at 102. What the majority has in mind by a “meaningful opportunity” is unclear, and this question is sure to breed a great deal of litigation in federal courts in the years to come.
For example, in this case, respondent filed a second grievance after his first grievance was rejected, arguing that his first grievance was in fact timely because he was challenging petitioners’ continuing prohibition on his capacity to partici *121 pate in Catholic observances, such as Confession, Holy Week services, and Bible study. The prison again rejected this second grievance on timeliness grounds, even though the denial of respondent’s capacity to engage in religious activities was clearly ongoing, and thus had occurred within the prison’s 15-day statute of limitations. See 403 F. 3d 620, 622 (CA9 2005). Assuming respondent explicitly requested the restoration of his right to engage in religious activities within 15 days of the filing of his second grievance and prison officials denied the request, did petitioners’ grievance procedures fail to provide respondent with a “meaningful opportunity” to raise his claim, because, in light of the continuing nature of the injury respondent is challenging, his grievance was in fact timely? Cf. Klehr v. A. O. Smith Corp., 521 U. S. 179, 189 (1997) (explaining that, under the Clayton Act, each overt act in the case of a “continuing violation,” such as a price-fixing conspiracy, is sufficient to restart the statute of limitations).
What about cases involving other types of procedural missteps? Does a 48-hour limitations period furnish a meaningful opportunity for a prisoner to raise meritorious grievances in the context of a juvenile who has been raped and repeatedly assaulted, with the knowledge and assistance of guards, while in detention? See Minix v. Pazera, No. 1:04 CV 447 RM, 2005 WL 1799538, *2 (ND Ind., July 27, 2005). Does a prison grievance system provide such a meaningful opportunity when women prisoners fail to file timely grievances relating to a pattern of rape and sexual harassment throughout a city’s prisons, because they correctly fear retaliation if they file such complaints? See Women Prisoners v. District of Columbia, 877 F. Supp. 634 (DC 1994). Are such remedies meaningful when a prisoner files a grievance concerning a prison official having encouraged him to commit suicide, which the prisoner reasonably thinks raises one claim, but which prison officials interpret to raise two separate claims—one related to the guard’s comments and one related *122 to the prisoner’s failure to receive health care—and thus dismiss for violating a prison regulation against including more than one claim in a single grievance? See Harper v. Laufenberg, No. 04-C-699-C, 2005 WL 79009, *3 (WD Wis., Jan. 6, 2005). What if prison officials dismiss a timely filed appeal because the prisoner explains that the prison will take two weeks to finish making certain copies of relevant documents by sending a letter to the Secretary of the Department of Corrections, rather than to the Secretary of Inmate Grievances and Appeals, as he should have under the prison regulations? See Keys v. Craig, 160 Fed. Appx. 125 (CA3 2005) (per curiam). More generally, are remedies meaningful when prison officials refuse to hear a claim simply because a prisoner makes some hypertechnical procedural error? See Spruill v. Gillis, 372 F. 3d 218, 232 (CA3 2004) (imposing a procedural default sanction in the PLRA, but stating that compliance with grievance proceedings need only be “ ‘substantial’”); Giano v. Goord, 380 F. 3d 670, 676-678 (CA2 2004) (stating that failure to comply with procedural requirements in grievance proceedings may be excused based on special circumstances, such as a prisoner’s reasonable, but mistaken, understanding of prison regulations).
Depending on the answer to questions like these, the majority’s interpretation of the PLRA may cause the statute to be vulnerable to constitutional challenges. “[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances.” Bill Johnson’s Restaurants, Inc. v. NLRB, 461 U. S. 731, 741 (1983). Accordingly, the Constitution guarantees that prisoners, like all citizens, have a reasonably adequate opportunity to raise constitutional claims before impartial judges, see, e. g., Lewis v. Casey, 518 U. S. 343, 351 (1996). Moreover, because access to the courts is a fundamental right, see id., at 346, government-drawn classifications that impose substantial burdens on the capacity of a group of citizens to exercise that right require searching judicial examination *123 under the Equal Protection Clause, see, e. g., Lyng v. Automobile Workers, 485 U. S. 360, 370 (1988).
The correct interpretation of the PLRA would obviate the need for litigation over any of these issues. More importantly, the correct interpretation of the statute would recognize that, in enacting the PLRA, Members of Congress created a rational regime designed to reduce the quantity of frivolous prison litigation while adhering to their constitutional duty “to respect the dignity of all persons,” even “those convicted of heinous crimes.” Roper v. Simmons, 543 U. S. 551, 560 (2005). Because today’s decision ignores that duty, I respectfully dissent.

 Because we have used the term “waiver” in referring to this sanction in the habeas corpus context, I use that term in this opinion. Strictly speaking, it would be more accurate to characterize this sanction as a “forfeiture” sanction, as there is no question that prisoners do not, by making a procedural error in the course of exhausting administrative remedies, purposefully relinquish their right to bring constitutional claims in federal court.

 The majority does not claim that the plain language of the statute dictates its decision, but rather that the text “strongly suggests” that the PLRA includes a procedural default sanction, ante, at 93. The majority then states: “Section 1997e(a) refers to 'such administrative remedies as are available,’ and thus points to the doctrine of exhaustion in administrative law.” Ibid. The reference to “administrative remedies” simply addresses the fact that the review procedures provided by prison officials are administrative in character rather than judicial. At any rate, as discussed in Part III, infra, the doctrine of exhaustion in administrative law does not support the majority’s engraftment of a procedural default sanction into the PLRA.

 See generally O’Sullivan v. Boerckel, 526 U. S. 888, 850-853 (1999) (Stevens, J., joined by Ginsburg and Breyer, JJ., dissenting) (tracing history of exhaustion requirement in habeas law).

 This language is, in relevant part, identical to the language as it was enacted in 1948. See 62 Stat. 967.

 In habeas law it is a separate judge-made doctrine of procedural default, stemming from our decision in Wainwright v. Sykes, 433 U. S. 72 (1977), that may bar relief even though a claim has been exhausted. This procedural default doctrine is based on unique considerations of comity in the habeas context, including the need to ensure that the state criminal trial remains the “main event” rather than a “tryout on the road” for a later federal habeas proceeding. Id,., at 90 (internal quotation marks omitted). Moreover, procedural default in habeas is closely related to the principle that this Court lacks certiorari jurisdiction to review a state-court judgment that rests on an adequate and independent state proce *109 dural ground. See id., at 81-82. It is undisputed that these unique considerations do not apply in the context of 42 U. S. C. § 1983 suits, because the “very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people’s federal rights.” Mitchum v. Foster, 407 U. S. 225, 242 (1972). Accordingly, the majority correctly does not suggest that we incorporate our procedural default jurisprudence from the federal habeas context into prison conditions suits under § 1983.
Nonetheless, I fear that the majority’s analysis may actually create a harsher procedural default regime under the PLRA than the judge-made procedural default doctrine in habeas law. But see Muhammad v. Close, 540 U. S. 749, 751 (2004) (per curiam) (stating that “[prisoners suing under § 1983 ... generally face a substantially lower gate [than prisoners seeking habeas corpus relief], even with the requirement of the Prison Litigation Reform Act of 1995 that administrative opportunities be exhausted first” (citing 42 U. S. C. § 1997e(a))). Our habeas jurisprudence allows petitioners to overcome procedural defaults if they can show that the procedural rule is not firmly established and regularly followed, see James v. Kentucky, 466 U. S. 341, 348 (1984), if they can demonstrate cause and prejudice to overcome a procedural default, or if enforcing the procedural default rule would result in a miscarriage of justice, see Murray v. Carrier, 477 U. S. 478 (1986).

 The majority’s attempt to distinguish Sims as concerning “different questions,” ante, at 91, n. 2, is perplexing, particularly in light of the fact that the United States, in its brief supporting petitioners, relies on Sims to argue that our administrative law decisions support the proposition that the Court should impose a waiver sanction into the PLRA. See Brief for United States as Amicus Curiae 11. Although the particular procedural error made during the exhaustion of administrative remedies was different in Sims than the procedural error at issue here, our analysis in Sims *113 concerned the circumstances under which we should or should not engraft a waiver sanction into the administrative exhaustion process generally. See 530 U. S., at 108-112; id., at 112-113 (O’Connor, J., concurring in part and concurring in judgment); id., at 114-115 (Breyer, J., dissenting).

 The majority’s suggestion that habeas law indicates otherwise, see ante, at 91-92, n. 2, is incorrect. As explained above, see n. 5, swpra, the judge-made procedural default sanction in habeas law is based on unique considerations that do not apply to § 1983 suits. Our precedent concerning judicial review of administrative proceedings, upon which the majority purports to rely, see ante, at 93, makes clear that we will not impose a waiver sanction when judicial review of the administrative decision does not resemble appellate review of lower court decisions.

 The majority notes that many prisoners proceed pro se in federal court, where there are also time limits and other procedural requirements. See ante, at 102. However, the timeliness and other procedural requirements of prison grievance systems are generally far more stringent than those imposed by federal courts. See Brief for American Civil Liberties Union et al. as Amici Curiae 6, n. 1, 25-27; Brief for Jerome N. Frank Legal Services Organization of Yale Law School as Amicus Curiae A1-A7.

 Of course, if the majority were serious that “what matters is not whether proper exhaustion was necessary to reach [policy goals], but whether proper exhaustion was mandated by Congress,” ante, at 94, n. 4, its opinion would not rest almost entirely on policy arguments.

 In this regard, the majority’s reference to Coleman v. Thompson, 501 U. S. 722, 735, n. (1991), see ante, at 96, is perplexing. If a prison regulation explicitly grants prison officials discretion to consider untimely or otherwise proeedurally defective grievances, of course prison grievance remedies would still be “available,” and thus unexhausted, if a prisoner had not even tried to file a grievance simply because it was untimely or otherwise proeedurally defective.

 Without any support, the majority speculates that the drop in suits filed by prisoners between 1995 and 2000 resulted from other provisions of the PLRA. See ante, at 94, n. 4. Regardless, the aforementioned statistics demonstrate that the procedural default sanction imposed by the PLRA is unnecessary to reduce the quantity of prison litigation.

 The majority also argues that ensuring strict compliance with strict prison timeliness requirements (generally ranging from 48 hours to a month, see n. 15, infra) will improve the quality of prisoner litigation because if “a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved.” Ante, at 95. While these are advantages to filing grievances soon after the alleged injury occurs, courts regularly resolve § 1988 (and other) litigation without *117 such Draconian time limitations. At any rate, as discussed below, legislation does not pursue any one purpose at all costs, and the marginal advantages of encouraging compliance with such short time limitations do not justify judicially rewriting the PLRA’s exhaustion requirement by engrafting a procedural default sanction into the statute.

 Indeed, if anything, it will have a worse effect on meritorious claims; prisoners who file frivolous claims are probably more likely to be repeat filers, and to learn the ins and outs of all procedural requirements.

 See, e. g., Daskalea v. District of Columbia, 227 F. 3d 433, 437, 439 (CADC 2000) (discussing how female prisoner had her underwear confiscated as “ ‘contraband’ ” and was placed in solitary confinement without a mattress as a result of talking to prison officials about the sexual assaults and harassment to which guards had subjected her).

 For a comprehensive discussion of state prison grievance system filing deadlines, see Brief for American Civil Liberties Union et al. as Amici Curiae 6, n. 1, and Brief for Jerome N. Frank Legal Services Organization of Yale Law School as Amicus Curiae A1-A7..